# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

ALBERT LUTHER JEFFCOAT,    )
    )
    Petitioner,    )
    )
v.    )    Case No. CV412-176
    )
WARDEN DENNIS BROWN,    )
    )
    Respondent.    )

## REPORT AND RECOMMENDATION

An Effingham County Superior Court jury found Albert Luther Jeffcoat guilty of kidnapping with bodily harm. (Doc. 1 at 3.) He was sentenced to serve 20 years' imprisonment. (*Id.*) He now petitions this Court for 28 U.S.C. § 2254 relief. (*Id.* (initial petition); doc. 18 (amended petition).) The state has responded in opposition. (Doc. 19.) For the following reasons, the petition should be denied.

## I. BACKGROUND

Jeffcoat served in the United States Army from 1970 through 1990, deployed to Vietnam, and later worked for the Savannah Police

Department from 1990 until 2003. (Doc. 23-4 at 31 (second tr. transcript).) While there, he helped pioneer several community crime prevention and protection programs, including Savannah Safe Children's Program. (*Id.* at 32.) He married his childhood sweetheart, Hilda Partridge. (*Id.* at 33.) During his last few years with the police department, he frequently traveled and gave seminars on fraud prevention. (*Id.*) But also during that time, he had an affair with a woman in North Carolina. (*Id.* at 34.) It caused problems for Jeffcoat at work, and he eventually took retirement. (*Id.* at 15.) Then Hilda sued for divorce. (*Id.* at 34.) On November 22, 2004, the day before the divorce became final, Jeffcoat kidnapped her.

The trial testimony painted a chilling story. According to Hilda, after some wrangling over the divorce and living situations, Jeffcoat took her by surprise on the morning of November 22, 2004. He asked her to retrieve something from the master bedroom's closet. When she turned around he had a gun pointed at her, and he demanded that she get on his bed (she slept in another room); she refused. (Doc. 23-5 at 103-04.) He

then pepper-sprayed her and handcuffed her. [1] (*Id.* at 105-06.) Afterwards, Jeffcoat let her clean her face, and then he read her a letter recounting his version of the divorce proceedings. Later, he made her take a shower. (*Id.* at 107-13.) He re-handcuffed her and proceeded to sexually assault her, culminating in rape.[2] (*Id.* at 115-16.)

Afterwards, he explained that because of his actions he had at least three or four felonies against him, so the only thing he could do was kill her and himself in order to avoid prison. (*Id.* at 121-22.) After a second round of sexual assaults, he said he should just kill her and go to the woman he had an affair with. (*Id.* at 123.) Shortly after, she noticed that he had disabled the home phone, and he admitted that he had soaked her cell phone in water, ruining it. (*Id.* at 125-26.) Eventually, he slipped off her handcuffs, escorted her to his Ford F-150, and got her situated on the passenger seat. (*Id.* at 128.)

---

[1] Notably, officers who searched the home later discovered pepper spray and a pair of handcuffs out in plain view. They also noticed the distinct odor of pepper spray in the master bedroom. (Doc. 23-4 at 100.)

[2] A nurse, trained in sexual assault, examined Hilda and found evidence consistent with her story of sexual assault. Hilda was tense and distraught. (Doc. 23-4 at 128.) She was bruised in the upper back, outer arms, spine, and inner legs. (Doc. 23-5 at 4.) She was bleeding in the cervical area, which is generally only caused by some sort of penetration in a post-menopausal woman like her. (Doc. 23-4 at 132.)

Thinking that he was driving her somewhere to kill her, Hilda attempted to escape when they came to an intersection with a few vehicles headed the other way. (*Id.* at 139-140.) John Sauerland, who was heading home from a golf outing with some friends, passed Jeffcoat's white Ford F-150 near the intersection. He saw Hilda frantically trying to escape, but Jeffcoat grabbed her around the neck and forcefully yanked her back in the vehicle. (Doc. 23-4 at 60-61 (Sauerland's trial testimony; doc. 22-4 at 94 (911 call from Sauerland).) Sauerland immediately called 911 to report the incident. (Doc. 23-4 at 60-61.)

A few minutes later, when Jeffcoat executed a U-turn in the city of Guyton, she managed to escape his grasp. (Doc. 23-5 at 141-42.) She ran to a house and rang the doorbell, but nobody answered. (*Id.*) Then, spotting City Hall, she sprinted there and ran inside while frantically screaming that her husband was going to kill her. (*Id.* at 143.) City Hall employees immediately locked the doors and called 911. (Doc. 23-4 at 72-77 (City Hall employee Debra Scruggs' trial testimony).)

Once officers arrived at City Hall, they asked Hilda to accompany them back to her house, but she refused. Instead, she gave them the access code to enter through the garage. (Doc. 23-4 at 85.) In addition

to locating pepper spray and a pair of handcuffs inside the residence,

officers also discovered what appeared to be a type-written suicide note:

> No long good-bye . . . I pray that god will forgive me for what I have done. Please no funeral, memorial, or other good-byes . . . It is only hoped that my body will be cremated and my ashes thrown into the wind.
>
> While I always tried to accept responsibility for my actions, even agreeing to an uncontested divorce, Hilda did not have to be so mean and nasty. It [is] absolutely amazing that when [she was] around other people Hilda was an angel. But when alone with one another during the last 3 months Hilda has been so very - very - very cruel. Willfully making vicious and degrading comments only to hurt me as a person.   I begged, TRULY BEGGED, that ou[r] marriage not end in a mean and nasty manner and asked so many times that Hilda try to be kind. As we had talked about it, Hilda knew, without any question whatsoever, that her[] comments and actions were hurtful . . . Comments like "Bert, I don't need you anymore". I often reminded Hilda that I am not a "Bastard Dog" that that she did not have to destroy[] my self[-]respect and dignity. In that I never deliberately hurt anyone before, I guess what bothers me more than anything else is the fact that Hilda's actions and comments have been callous and deliberate.   [S]o willful
>
> Ms. Kay Newsome, of the Savannah Postal Credit Union, has a copy of my Last Will.

(Doc. 24-3 at 31; doc. 23-4 at 104 (read into evidence by Corporal Pete

Hosalla of the Effingham County Sheriff's Office during trial).)

Jeffcoat told a very different story.  He stated that they did have

sex, but it was consensual and that afterwards Hilda attacked him and he

pepper-sprayed her in self-defense.  (Doc. 24-1 at 23-26.)  Because the

"mace" was in the air, they went for a drive. (*Id.* at 35.) Her attempt to flee from the vehicle was a malicious plan on her part to drum up charges against him. (*Id.* at 38-39.) He simply grabbed her because he was startled and didn't want her getting hurt. (*Id.* at 39.) He eventually just let her go near Guyton. (*Id.* at 42.) He does not deny, however, that he fled to South Carolina and stayed in a hotel while attempting to retain an attorney and that he went back to his house to grab his laptop on Wednesday morning. (Doc. 24-1 at 42, 87.)

Jeffcoat was indicted in the Effingham County Superior Court for, *inter alia*, kidnapping with bodily injury.[3] (Doc. 21-3 at 71 (most recent indictment).) After the first trial ended in a mistrial with a hung jury (doc. 21-2 at 44), attorney Jacque Hawk represented Jeffcoat at his second trial. (Doc. 23-2 at 120.) The jury found him guilty of kidnapping with bodily injury (doc. 21-3 at 77), and the Superior Court judge sentenced him to life imprisonment, which is Georgia's mandatory minimum for that charge. (Doc. 24-2 at 39.) On October 13, 2006, Hawk filed a motion for new trial asserting that the trial judge had failed to properly

---

[3] The indictment also charged him with aggravated oral sodomy, rape, and possession of a firearm or knife during the commission of a felony. (Doc. 21-3 at 71.) As noted in text, the jury only convicted him on the kidnapping charge. (Doc. 21-3 at 77.)

charge the jury as to the elements of kidnapping with bodily injury. (Doc. 20-1 at 19.) The court denied the motion for new trial but admitted error in charging the jury, then re-sentenced Jeffcoat to 20 years' imprisonment for kidnapping. (Doc. 22-7 at 14 (finding harmful error as to the improper jury charge of bodily injury-kidnapping, but finding sufficient evidence to convict Jeffcoat of kidnapping);doc. 20-5 at 1 (state habeas order outlining case history).)

Some of Jeffcoat's family members attempted to retain Peter Johnson to represent Jeffcoat on appeal, as Jeffcoat made it clear that he wanted to raise ineffectiveness claims against Hawk. (Doc. 20-5 at 10.) Johnson filed a notice of appeal on June 21, 2007. (*Id.*) Hawk withdrew on June 22, 2007. (*Id.* at 2; doc. 22-8 at 30.) On June 25, 2007, however, Hawk filed a second notice of appeal. [4] (Doc. 31-1 at 6.) On August 8, 2007, Johnson withdrew from the case upon learning that Jeffcoat did not want him as his appellate counsel. (Doc. 20-5 at 10.) Nearly simultaneously, Jeffcoat filed a motion to dismiss the appeal without

---

[4] Despite repeated references in the record stating that Hawk had filed a notice of appeal, the state habeas court noted that it found no evidence that the notice was ever docketed in the appellate court. (Doc. 31-1 at 5 (state habeas court's second order, dated May 5, 2011).)

prejudice. (Doc. 24-6 at 113.[5]) On August 9, 2007, the court of appeals noted that it lacked the ability to dismiss an appeal without prejudice, but it construed the request as a motion for permission to withdraw the appeal, which it granted. (Doc. 21-8 at 16.) Hence, Jeffcoat never enjoyed direct appellate review of his conviction on the merits.

Two days prior to the appellate court's order, Jeffcoat filed a petition for state habeas relief in the Superior Court of Washington County, Georgia. (Doc. 20-1 at 1 (filed Aug. 7, 2007).) He raised 41 grounds for relief, but eventually amended it to add 44 additional grounds. (Doc. 20-1 at 1-23; doc. 20-2 at 1-216; doc. 20-3 at 1- -71; doc. 20-4 at 1-51.) The state habeas court found that he failed to state a claim at all as to amended ground 19. (Doc. 20-5 at 22.) Grounds 39 and 41, which related to ineffective assistance of appellate counsel, failed under

---

[5] Jeffcoat indicated that he was without counsel, and stated the following:

> The above stated facts clearly show that two (2) separate Notice of Appeals have been filed by separate attorneys with the Court of Appeals, on the same case, and that the defendant is now without any legal representation whatsoever. Where foregoing Notice of Appeals were filed under circumstances which negates the orderly procedure of the court, and which effectively renders the defendant's appellate process hereto moot, the defendant prays that the Court of Appeals will dismiss the foregoing Notice of Appeals without prejudice.

(Doc. 24-6 at 113.)

*Strickland v. Washington*, 466 U.S. 668 (1984).[6]   (*Id.* at 20-22.)

Amended ground 44, which claimed that Jeffcoat was denied his right to appeal since the trial court failed to appoint counsel when Hawk withdrew, was denied because petitioner never requested that the court appoint appellate counsel.   (*Id.* at 22.)   The habeas court found that all of his remaining claims were procedurally defaulted because they were not raised on appeal, and that he failed to show cause and prejudice or demonstrate a miscarriage of justice sufficient to excuse the procedural default.   (*Id.* at 2-20.)

The Georgia Supreme Court granted a certificate of probable cause as to amended ground 44, where Jeffcoat claimed that the trial court erred by failing to appoint appellate counsel once Hawk withdrew.   (Doc. 20-6 at 1.)   It noted that an indigent need not specifically request appointment of counsel if it was clear that he desired such an appointment.   (*Id.*)

---

[6] For ineffective assistance of counsel to provide a basis for federal habeas relief, movant must satisfy the two-part test from *Strickland*, 466 U.S. at 687. First, he must show that his counsel's performance was deficient and that it prejudiced his defense. *Id.* To show prejudice, movant need only demonstrate a reasonable probability that the result of the proceeding would have been different absent the error. *Id.* at 694. A reasonable probability in this context is "a probability sufficient to undermine confidence in the outcome." *Id.*   Jeffcoat thus must establish both deficient performance and prejudice in order to establish ineffective assistance of counsel. *Id.* at 687.   "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

Upon further review of amended ground 44, the state habeas court catalogued the litany of lawyers who had represented Jeffcoat at one time or another over the course of the criminal proceedings. As noted by that court, prior to Jacque Hawk, Jeffcoat had been represented by Robert Lanier, Stephen Yekel, Terry Jackson, and Martin Hilliard.[7] (Doc. 31-1 at 2.) Lanier represented Jeffcoat at the first trial but withdrew after it was declared a mistrial. (*Id.* at 3) As discussed above, Hawk, from a different public defender's office, stepped in on August 21, 2006, to represent Jeffcoat through the second trial. (*Id.*) Shortly after Hawk won the reduced, twenty-year sentence, Jeffcoat's sisters met with attorney Peter Johnson. (*Id.* at 4.) They told Johnson that there were funds available to pay for his services but Jeffcoat would have to clear the expenditure. (*Id.*) Believing that he would be retained, Johnson entered a notice of appeal on June 21, 2007, but Jeffcoat refused Johnson's request for a lump sum payment and stated that he would only

---

[7] Hilliard withdrew, noting that Jeffcoat's "failure to follow Counsel's advice and argumentativeness has queered the Attorney-Client relationship." (Doc. 31-1 at at 2 (state habeas court order quoting withdrawal motion).) Jeffcoat's jailer at the time also wanted nothing to do with him. Effingham County Sheriff Jimmy McDuffie stated that Jeffcoat was a nuisance and the 'worst inmate' in recent years, requiring more work and receiving greater privileges than the county's other inmates." *Sheriff, Jeffcoat both want ex-policeman out of Effingham Jail*, Savannah Morning News http://savannahnow.com/stories/090605/3271887.shtml (last visited Mar. 6, 2014).

pay Johnson on an installment basis. (*Id.*) Hawk was allowed to withdraw on June 22, 2007. (*Id.* at 5.) Hawk's June 25, 2007 notice of appeal requested that the court appoint new counsel for Jeffcoat's appeal. (*Id.* at 6.) Johnson withdrew on August 8, 2007, the day before the appellate court allowed Jeffcoat to withdraw his appeal. (Doc. 20-5 at 10.)

The state habeas court concluded that despite Hawk's request that counsel be appointed for Jeffcoat, the trial court, which otherwise would have appointed counsel in this instance, was under the reasonable impression that Jeffcoat had retained Peter Johnson to handle his appeal. (Doc. 31-1 at 7.) Moreover, Jeffcoat had actually admitted to the court at one point that he was *not* indigent, but it continued to appoint new trial attorneys anyway, which was within its discretion. (*Id.* at 8.) Most critically, Jeffcoat never took any action to put the court on notice that he had dismissed Johnson and desired the appointment of appellate counsel. (*Id.*) Instead, he withdrew his appeal; Johnson was still listed as counsel of record until the day before the appellate court dismissed the action. (*Id.*) "Short of divining Petitioner's need for appointed appellate counsel, the trial court could not know of Petitioner's desire for appointed

counsel." (*Id.*) And upon withdrawing his appeal, he utterly deprived the trial court of an opportunity to review the matter. (*Id.*) As such, "[t]he situation in which Petitioner finds himself is the unfortunate masterpiece of his own intransigence." (*Id.*) It again denied amended ground 44 (*id.*), and this time the Supreme Court of Georgia denied Jeffcoat's certificate of probable cause to appeal. (Doc. 20-10 at 1.)

On June 25, 2012, Jeffcoat petitioned this Court for 28 U.S.C. § 2254 relief, raising 91 claims of error. (Doc. 1.) He moved for appointment of counsel (doc. 4), but Barbara B. Claridge then entered an appearance on his behalf. (Doc. 8.) The Court granted her a generous extension of time to file an amended petition. (Doc. 17.) She filed it on February 12, 2013, raising multiple grounds for relief. (Doc. 18.) The state has responded, so the case is ready for review. [8] (Doc. 19.)

---

[8] Jeffcoat's dealings with his retained § 2254 attorney have been contentious to say the least. Claridge herself noted that he had terminated and then re-retained her services twice over the course of these proceedings. (Doc. 16.) She represented, however, that they had had a meeting of the minds and that he approved her filing of an amended petition on his behalf. (*Id.*)

One month after receiving the government's response, Jeffcoat stated that he had never intended for her to file anything in this case and that he had retained her purely for the purpose of reviewing the case. (Doc. 25.) But he acknowledged that she presented him with the amended pleading before filing it, and he never stated that he rejected her representation of him or directed that she not file the amended petition. He nevertheless asked the Court to reinstate his initial petition. (*Id.*; doc.

12

## II. ANALYSIS

Jeffcoat's amended petition lists only a single count ("Count One") with multiple sub-parts. (Doc. 18 at 5-24.) While the petition fails to follow the format prescribed by Rule 2(c) & (d) of the Rules Governing Section 2254 Cases in the United States District Courts,[9] re-briefing would serve no purpose, since the Court was not substantially hindered in isolating Jeffcoat's claims. He asserts that he received ineffective assistance of counsel before trial, at trial, during his motion for new trial, in filing a notice of appeal, and in withdrawing from the case. (Doc. 18 at

28 (also requesting that the Court find Claridge's notice of appearance a nullity and reinstate his earlier petition).)

If Jeffcoat had wished to terminate Claridge's appearance on his behalf, all he had to do was notify the Court that he had fired her and would continue *pro se*. Instead, he waited *eight months* -- after she filed her notice of appearance, after she submitted the amended petition, and more than a month after the government filed its response -- before indicating that he never authorized her to file the amended petition. Jeffcoat knew that Claridge was acting as his counsel and had filed an amended petition on his behalf. It was only after the state's response highlighted weaknesses in that petition that he sought to resurrect the earlier petition.

His request to proceed *pro se* is **GRANTED**. The Court, however, construes his request to reinstate the earlier pleadings (docs. 25 and 28) as out-of-time motions to amend his petition. Those requests are **DENIED**, given that the time for amending the pleadings had long-since passed, Jeffcoat has already been given one chance to amend his pleadings, and the state has already been put to the burden of responding to the amended pleading.

[9] Jeffcoat submitted a "complaint" style pleading rather than a pleading that substantially follows the § 2254 form used by this Court. Rule 2(d), Rules Governing Section 2254 Cases in the United States District Courts.

6-11.) He also claims that he was denied the right to proceed *pro se* at trial (*id.* at 17), denied access to counsel by the conditions of his bond (*id.* at 13-14),[10] and denied his Fifth, Sixth, and Fourteenth amendment rights in connection with statements made to a psychologist (*id.* at 11-13). Additionally, he claims that the prosecution repeatedly committed misconduct (*id.* at 15-16), the state violated his due process rights by misplacing certain exculpatory evidence (*id.* at 16-17), and it failed to preserve other exculpatory evidence. (*Id.* at 14-15.) The state trial court, according to Jeffcoat, denied him due process when it denied his request for an instruction of lesser included offenses and when it "pressured" the jury into finishing its deliberations by a certain time. (*Id.* at 17-20.) Finally, he claims that he was denied the "right" to act as co-counsel during his motion for new trial and resentencing (though he was actively represented by Hawk at both proceedings) and that the trial

---

[10] This, like many of his claims, is an outright fabrication. Jeffcoat was never denied access to counsel. He was simply instructed to stay, at all times, with his sister in South Carolina as a condition of his release. (Doc. 18-1 at 81-82.) A person held in pretrial detention faces at least as many obstacles in conferring with counsel as did Jeffcoat.

court improperly denied him the appointment of counsel on appeal.[11]   (*Id.* at 21-22.)

## A.    Procedural Default

The vast majority of Jeffcoat's claims are procedurally defaulted under state law, and federal habeas review of those claims is barred because he has failed to demonstrate either cause for and resulting prejudice from the default or show that a failure to review the claims will result in a miscarriage of justice.    *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).   Only two of his many claims were addressed on the merits by the state habeas court.    Those non-defaulted claims will be considered in part II.B. below.

Foregoing his direct appeal, Jeffcoat raised many -- but not *all* -- of these claims in his state habeas corpus petition.[12]   As to the claims that

---

[11]   No such right exists under federal law.  *E.g.*, *United States v. LaChance*, 817 F.2d 1491, 1498 (11th Cir. 1987) (the "right to counsel and the right to proceed pro se exist in the alternative")

[12] Some of the claims Jeffcoat asserts before this Court parallel exactly claims raised in the state habeas proceedings.  He squarely raised his claims that Hawk rendered deficient performance by failing to (1) object to the district attorney's mention of evidence on a computer during closing arguments, (2) object to the prosecution's characterization of DNA evidence; (3) object when the prosecution argued that Jeffcoat lost his job due to an extramarital affair; (4) challenge the indictment; and (5) by withdrawing Jeffcoat's jury charges on self-defense and similar transactions.  (Doc. 18 at 6-11.)  Similarly, he raised his claims that (1) the trial court violated his rights by forcing him to submit to a mental health evaluation, (2) the state

Jeffcoat did assert (either directly or obliquely) in his state habeas petition, the state court refused to consider those claims on procedural grounds because Jeffcoat failed raise them on direct appeal.   (Doc. 20-5 at 10, 20.)   Georgia law prohibits a state habeas court from reviewing any claim that was not raised in a timely manner under the proper procedure at trial and on direct appeal, absent a showing of cause for the noncompliance and actual prejudice or a resulting miscarriage of justice. O.C.G.A. § 9-14-48(d); *Agan v. Vaughn*, 119 F.3d 1538, 1549 (11th Cir. 1997); *Black v. Hardin*, 255 Ga. 239, 239 (1985).   This procedural rule, which requires that all claims be raised at the earliest practicable moment, is applicable to claims of ineffective assistance of trial counsel.

---

violated his rights by failing to preserve exculpatory evidence, (3) the state impermissibly argued an "any evidence" theory regarding the kidnapping; (4) the prosecutor impermissibly vouched for a witness; (5) the state impermissibly mentioned evidence on a computer that wasn't admitted to corroborate the statement; (6) the state impermissibly argued that Jeffcoat lost his job due to the affair; and (7) the trial court violated his rights by refusing to include the lesser-included offenses of aggravated assault and battery in the jury charges. (*Id.* at 11, 14-16, 17.)   Many of his remaining claims are sufficiently different to call into question whether they were "fairly presented" to the state habeas court, either because they rest on a different constitutional theory or they rely upon substantially different facts.   *See Fields v. Tankersley*, 487 F. Supp. 1389, 1391 (S.D. Ga. 1980) ("this Court is precluded from the consideration of the substance of [petitioner's claims] until the issues have been squarely and fairly presented to the Georgia courts for their consideration").   And some claims that Jeffcoat now urges in this Court were never raised at all before the state court.   As will be explained in text, the procedural default doctrine forecloses consideration of both claims that Jeffcoat squarely presented to the state habeas court and to the claims that he either never raised or did not "fairly present" to that court.

*White v. Kelso*, 261 Ga. 32, 32 (1991); *Thompson v. State*, 257 Ga. 386, 387 (1987). [13]  Such claims are required to be raised "at the first possible stage of post-conviction review."  *White*, 261 Ga. at 32; *Thompson*, 257 Ga. at 387.  Thus, where a defendant has new counsel on appeal, he "must raise the ineffectiveness of previous counsel" before the appellate court.  *White*, 261 Ga. at 32.  If the record is inadequate to permit review of that claim on direct appeal, then the court will remand the issue to the trial court for a determination of the claim, and it will hear on appeal any challenge to the trial court's ruling.  *Elrod v. State*, 316 Ga. App. 491, 495-96 (2012); *McMahon v. State*, 308 Ga. App. 292, 295-96 (2011); *Smith v. State*, 255 Ga. 654, 656 (1986); *see also Hendrix v. State*, 268 Ga. App. 455, 457 (2004) (when "the record is sufficient, . . . an appellate court may decide ineffectiveness issues without remanding the case when the remand would waste judicial and legal resources and serve no useful purpose.").

All of the claims that Jeffcoat presented to the state habeas court (with the exception of the two addressed in the next section) were capable

---

[13]  The state habeas court explicitly relied upon O.C.G.A. § 9-14-48(d) in denying all of Jeffcoat's claims, including his trial-counsel-ineffectiveness claims.  (Doc. 20-5 at 10, 20.)

of review on direct appeal. But Jeffcoat deprived the state appellate court from considering his claims -- including his claims of ineffective assistance of trial counsel[14] -- by withdrawing his appeal. Because the claims were available to be asserted but were not preserved on appeal, the state habeas court properly declined to consider them. (Doc. 20-5 at 10, 20 (applying O.C.G.A. § 9-14-48(d).) Where, as here, "the last state court rendering judgment clearly and expressly stated that its judgment rested on a procedural bar, i.e., an adequate and independent state ground," *Bailey v. Nagle*, 172 F.3d 1299, 1303 (11th Cir. 1999), this Court must respect its determination. *Atkins v. Singletary*, 965 F.2d 952, 956 (11th Cir. 1998) (federal review of a  petitioner's claim is barred by the procedural default doctrine if the last state court to review the claim states clearly and expressly that its judgment rests on a procedural bar, and that bar provides an adequate and independent state ground for denying relief) (citation omitted).

The claims that Jeffcoat either never presented or did not fairly present to the state habeas court -- including his assertions that he was

---

[14] Jeffcoat's trial attorney (Hawk) had withdrawn after Jeffcoat made clear that he wished to challenge his effectiveness on appeal. Jeffcoat retained new counsel (Johnson) to handle that appeal but then dismissed his services over a fee dispute.

denied the right to proceed *pro se* at trial, denied effective assistance since the attorney handling his motion for new trial failed to raise ineffectiveness claims against *himself,* and denied due process or his right to counsel due to the conditions of his bond -- are procedurally defaulted for a different reason. "Before a federal court may grant habeas relief to a state prisoner, he *must* exhaust his remedies in state court. In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition." *O'Sullivan v. Boerckel,* 526 U.S. 838, 842 (1999); *Kelley v. Sec'y for Dep't of Corrs.,* 377 F.3d 1317, 1344 (11th Cir. 2004) ("To properly exhaust a claim, 'the petitioner must afford the State a full and fair opportunity to address and resolve the claim on the merits.'"); 28 U.S.C. § 2254(b)(1)(A) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State.").

The claims that Jeffcoat raises for the first time in his federal habeas petition are unexhausted, and ordinarily this Court would require the petitioner to present his unexhausted claims to the state court. But

"when it is obvious that the unexhausted claims would be procedurally barred in state court due to a state-law procedural default," the federal court "can forego the needless 'judicial ping-pong'" by applying the state's procedural bar rule for the state court where there is no "reasonable possibility that an exception to the procedural bar may still be available to the petitioner." *Snowden v. Singletary*, 135 F.3d 736 736, 737 (11th Cir. 1998); *Bailey*, 172 F.3d at 1305 ("[F]ederal courts may treat unexhausted claims as procedurally defaulted, even absent a state court determination to that effect, if it is clear from state law that any future attempts at exhaustion would be futile."); *Chambers v. Thompson*, 150 F.3d 1324, 1327 (11th Cir. 1998). "The unexhausted claims should be treated as if procedurally defaulted." *Ogle v. Johnson*, 488 F.3d 1364, 1370 (11th Cir. 2007) (citing *Bailey*, 172 F.3d at 1302). Here, no purpose would be served by requiring Jeffcoat to return to the state courts in an effort to exhaust any claims he has presented for the first time in his federal petition, for it is clear the state habeas court would bar them both because he failed to assert them on direct appeal, in violation of the contemporaneous objection rule discussed earlier (O.C.G.A. § 9-14-48(d)), and because consideration of those claims is precluded by Georgia's successive petition

rule. O.C.G.A. § 9-14-51. That rule requires a petitioner to raise all grounds for relief in his initial or amended state habeas petition; any grounds not raised are considered defaulted, unless state or federal constitutional law requires review or the claim could not have reasonably been raised in the original petition. *Id.*

Both sets of defaulted claims, those that were raised at the state level and those that were not, may still warrant federal review on the merits if the petitioner establishes cause for the default and resulting prejudice, or a miscarriage of justice arising from the incarceration of one actually innocent of any crime. *Gore v. Crews*, 720 F.3d 811, 816 (11th Cir. 2013).[15] Jeffcoat has made no such effort to excuse his procedural default. In fact, he has never contested respondent's contention that the vast majority of his claims are defaulted and thus do not merit review. His defaulted claims should therefore be denied.

---

[15] The actual innocence exception is "exceedingly narrow." *Johnson v. Alabama*, 256 F.3d 1156, 1171 (11th Cir. 2007). For it to apply, a petitioner must present "new reliable evidence" establishing his innocence. *House v. Bell*, 547 U.S. 518, 536–37 (2006); *Green v. United States*, 2011 WL 1897189 at * 6 (S.D. Ga. May 18, 2011). Jeffcoat has offered only his own spin on the record evidence. That is not new, reliable evidence.

Although Jeffcoat does not invoke this authority, the Court notes that the Supreme Court recently held that federal courts may find cause to excuse a state law procedural default of a substantial claim of ineffective assistance of trial counsel where the petitioner was not afforded effective counsel during his first meaningful opportunity to pursue the claim. *Martinez v. Ryan*, 566 U.S. ___, 132 S. Ct. 1309, 1315, 1318 (2012) (where a state *requires* that ineffective-counsel claims be raised in collateral proceedings rather than on direct appeal, the failure to do so may be excused on equitable grounds where the petitioner either was not afforded counsel on collateral review or counsel at that proceeding was ineffective); *Trevino v. Thaler*, ___ U.S. ___, 133 S. Ct. 1911, 1914-15 (2013) (extending *Martinez* to cases where state law permitted the ineffective-trial-counsel claim to be raised in a motion for new trial and reviewed on direct appeal but made it "'virtually impossible'" for the claim to be presented effectively under this procedure and, for all practical purposes, made collateral review the only "meaningful opportunity" to develop the claim).[16]

---

[16] *Martinez* and *Trevino* recognized a "narrow exception" to the rule in *Coleman v. Thompson*, 501 U.S. 722 (1991), that ineffective assistance of post-conviction counsel cannot establish "cause" to excuse a default since there is no constitutional right to an attorney in state post-conviction proceedings. The

Here, Jeffcoat's first "meaningful opportunity" to pursue his ineffectiveness-at-trial claims was on direct appeal, since he had secured new counsel after his trial. *Williams v. Moody*, 287 Ga. 665, 666 (2010). When he discharged that attorney, he had the right to request appointed counsel for his appeal, and had he done so and permitted the appeal to go forward, the Georgia Court of Appeals would have either decided his ineffectiveness claims on the existing trial record or remanded them for the court of conviction to develop the facts necessary to a resolution of those claims. *Elrod*, 316 Ga. App. at 495-96; *Hendrix v. State*, 268 Ga. App. 455, 457 (2004) (when "the record is sufficient, . . . an appellate court may decide ineffectiveness issues without remanding the case when the remand would waste judicial and legal resources and serve no useful purpose."). But Jeffcoat withdrew his own appeal, effectively denying the state court any opportunity to appoint him counsel on appeal or to consider his claims on the merits. Since the default was caused by Jeffcoat's *own* case mismanagement, not an attorney's ineffectiveness or a

---

procedure established in Georgia law for challenging the effectiveness of trial counsel does not involve the structural problems addressed in either *Martinez* or *Trevino*. Such claims may be adequately addressed on direct appeal (with remand to the trial court if necessary) where the defendant has new counsel on appeal. Jeffcoat simply chose not to avail himself of this opportunity.

court's refusal to provide him with counsel, *Martinez* and *Trevino* have no application here.[17]  *Lutz v. Valeska*, 2014 WL 868870 at *4-6 (M.D. Ala. Mar. 5, 2014).

Even if the appellate court erred by allowing Jeffcoat to withdraw his appeal without appointing new counsel or by failing to remand for a *Faretta v. California*, 422 U.S. 806 (1975) inquiry, Jeffcoat has failed to show any resulting prejudice.[18]  All of his trial-ineffectiveness claims are without merit.

Jeffcoat raises several trial phase ineffectiveness claims: (1) Lanier abandoned an interlocutory appeal regarding petitioner's *pro se* motion to preserve evidence; (2) Lanier failed to object to the "incompleteness" of the state's similar transaction evidence; (3) Hawk failed to object when the state impermissibly argued that petitioner had deleted evidence on his computer when there was no testimony or forensic evidence to

---

[17] The Eleventh Circuit has consistently held that cause for setting aside a procedural default "must result from some objective factor external to the defense that prevented [the petitioner] from raising the claim and which cannot be fairly attributable to his own conduct." *Wright v. Hopper*, 169 F.3d 695, 706 (11th Cir. 1999) (alteration added; quoting *McCoy v. Newsome*, 953 F.2d 1252, 1258 (11th Cir. 1992)); *see Jones v. Armstrong*, 637 F. App'x 256, 258 (2d Cir. 2010) (one's own ineffectiveness cannot constitute cause to excuse a default).

[18] Jeffcoat's claims against Lanier for his performance at the first trial, along with several other undeveloped claims (discussed in text), likely fail to meet the *Martinez* and *Trevino* requirement that the claims be "substantial."

corroborate the allegation; (4) Hawk failed to object when the state mischaracterized DNA evidence; (5) Hawk failed to object when the state impermissibly argued that petitioner lost his job due to the extramarital affair when there was no evidence presented on the matter; (6) Hawk failed to elicit testimony from Hilda regarding a $5,200 check she had forged, though it had been introduced at the first trial; (7) Hawk failed to "raise the issue of a defective indictment"; (8) Hawk withdrew petitioner's *pro se* jury charges without his consent; (9) Hawk failed to consult with petitioner about his appellate right until after the hearing on his motion for new trial; and (10) Hawk refused to raise the issue of ineffectiveness in the motion for new trial.   (Doc. 18 at 6-11.)

Jeffcoat's claims against Lanier are entirely frivolous.   The Court cannot conceive of any fact pattern in which Lanier's performance at a prior trial impacted the outcome of the next trial.[19]   Several of the other claims are floated without any elaboration.   Jeffcoat has utterly failed to

---

[19] In claim 1, Jeffcoat never says what evidence Lanier failed to preserve, why it was exculpatory, or what impact it would have had at trial.   Similarly, in claim 2, he fails to describe what "similar transaction" evidence was "incomplete."   His only record citations on those claims are to an order permitting defendant to secure evidence from his home and an interlocutory appeal on his denial of bond.   (Doc. 18-1 at 2-3; doc. 18-5 at 202)

argue claims 4,[20] 7, 8, 9, and 10.[21]   Those who seek habeas relief cannot

simply laundry-list their claims and hope that the court will develop

(hence, litigate) them on their behalf.   *Holmes v. United States*, 876 F.2d

1545, 1553 (11th Cir. 1989) (no hearing required on claims "which are

based on unsupported generalizations"); *Rodriguez v. United States*, 473

F.2d 1042, 1043 (5th Cir. 1973) (no hearing required where petitioner

alleged no facts to establish truth of his claims beyond bare conclusory

allegations).   Indeed,

> [t]he § 2254 Rules and the [28 U.S.C.] § 2255 Rules mandate "fact
> pleading" as opposed to "notice pleading," as authorized under
> Federal Rule of Civil Procedure 8(a). Coupled with the form petition
> or motion, the federal rules give the petitioner or movant ample
> notice of this difference. If, for example, Rule 2(c)(1) and (2) of the §
> 2254 Rules should cause a petitioner (or his counsel) to doubt what
> the words "specify all grounds" and "state the facts supporting each
> ground" mean, the CAUTION contained in paragraph (9) of the
> "Instructions" should remove such doubt. As the Supreme Court
> has observed, "[h]abeas corpus petitions must meet heightened
> pleading requirements, *see* 28 U.S.C. § 2254 Rule 2(c)." *McFarland*

---

[20] The state stated during its closing argument that "[t]his isn't a case where DNA matters because there would be DNA there [on the bed sheets] regardless.   (Doc. 18-2 at 584.)   It was no doubt correct.   The rape and sodomy charges stemmed from actions that allegedly occurred in Jeffcoat's own house with his soon-to-be ex-wife. Moreover, Jeffcoat *admitted* to having intercourse with her.

[21] Notably, Jeffcoat never states that Hawk failed to consult with him about his appellate rights, only that Hawk failed to do so until after the motion for new trial had been resolved.

*v. Scott*, 512 U.S. 849, 856, 114 S. Ct. 2568, 2572, 129 L.Ed.2d 666 (1994).

> The reason for the heightened pleading requirement -- fact pleading -- is obvious. Unlike a plaintiff pleading a case under Rule 8(a), the habeas petitioner ordinarily possesses, or has access to, the evidence necessary to establish the facts supporting his collateral claim; he necessarily became aware of them during the course of the criminal prosecution or sometime afterwards. The evidence supporting a claim brought under the doctrine set forth in *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963), for example, may not be available until the prosecution has run its course. The evidence supporting an ineffective assistance of counsel claim is available following the conviction, if not before. Whatever the claim, though, the petitioner is, or should be, aware of the evidence to support the claim before bringing his petition.

*Borden v. Allen*, 646 F.3d 785, 810 (11th Cir. 2011) (footnote omitted).

That means that Jeffcoat must not just raise but also *argue* his claims. *Fils v. City of Aventura,* 647 F.3d 1272, 1284 (11th Cir. 2011) ("district courts cannot concoct or resurrect arguments neither made nor advanced by parties."); *id.* at 1285 (a district court "may *not*, however, act as a plaintiff's lawyer and construct the party's theory of liability from facts never alleged, alluded to, or mentioned during the litigation."); *Lee v. Thomas*, 2012 WL 1965608 at *55 (S.D. Ala. May 30, 2012) ("This

Court is constrained not to fill in those blanks or develop petitioner's legal theories for him.").[22]   That includes citation to the trial court records:

> [A]ll of these principles of law would mean nothing if district courts were required to mine the record, prospecting for facts that the habeas petitioner overlooked and could have, but did not, bring to the surface in his petition. Making district courts dig through volumes of documents and transcripts would shift the burden of sifting from petitioners to the courts. With a typically heavy caseload and always limited resources, a district court cannot be expected to do a petitioner's work for him. *Cf. Adler v. Duval County School Board*, 112 F.3d 1475, 1481 n. 12 (11th Cir. 1997) (noting in a civil case that, absent plain error, "it is not our place as an appellate court to second guess the litigants before us and grant them relief ... based on facts they did not relate."); *Johnson v. City of Fort Lauderdale*, 126 F.3d 1372, 1373 (11th Cir. 1997) ("[W]e are not obligated to cull the record ourselves in search of facts not included in the statements of fact."). The Seventh Circuit memorably said that appellate judges "are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). Likewise, district court judges are not required to ferret out delectable facts buried in a massive record, like the one in this case, which was more than 25,000 pages of documents and transcripts.

*Chavez v. Sec'y Fl. Dep't of Corrs.*, 647 F.3d 1057, 1061 (11th Cir. 2011).

Jeffcoat's laundry-listed claims simply fail to meet that standard.

Hence, they must be denied.

---

[22]   *See also Lemons v. Lewis*, 969 F. Supp. 657, 659 (D. Kan. 1997) (it is not "the court's function to become an advocate for the *pro se* litigant"), *cited in Bivens v. Roberts*, 2009 WL 411527 at * 3 (S.D. Ga. Feb 18, 2009) ("judges must not raise issues and arguments on plaintiffs' behalf").

Jeffcoat's remaining claims are somewhat better developed, though just barely. In claim 3, he states that Hawk rendered deficient performance by failing to object when the state said during its closing argument that he had deleted evidence on his computer, yet there was no testimony corroborating the allegation. (Doc. 18 at 8.) The prosecutor stated that the reason Jeffcoat did not immediately turn himself into the authorities was partially because he needed to remove any trace of the apparent suicide note from his laptop. (Doc. 18-2 at 181.)

It is, of course, prosecutorial misconduct to argue "prejudicial facts not in evidence." *Berger v. United States*, 295 U.S. 78, 84 (1935). Assuming without deciding that such misconduct occurred, the question here is whether Hawk's failure to object during the closing argument would have been likely to have changed the outcome of the proceedings. *Strickland*, 466 U.S. at 687. It would not. First, it was clear from the context of the statement that the prosecutor was speculating as to what had happened between the time of Hilda's escape and Jeffcoat's surrender. Second, the trial judge explicitly charged the jury that Jeffcoat could only be judged on the evidence presented at trial, which "does not include . . . closing arguments by the lawyers." (Doc. 18-2 at

204.) The judge's curative instruction and the overwhelming evidence of guilt undermine any showing of prejudice. Consequently, this claim is without merit.

In claim 5, Jeffcoat states that the prosecuting attorney impermissibly stated during closing argument that Jeffcoat had lost his job due to the extramarital affair, yet there had been no evidence presented to the jury on that matter. (Doc. 18 at 9.) The prosecutor, however, did no such thing. Nowhere on the transcript pages to which Jeffcoat cites does the prosecutor state that Jeffcoat lost his job due to the affair:

> We're not talking about a cop, we're not talking about an active duty police officer. We're talking about someone who left Savannah Police Department not because of physical reasons but he left, what, a year or more earlier. So we're not talking about an active duty police officer doing this, we're talking about someone who's no longer with the police department, someone who by his own admission has strayed from his marital vows . . .

(Doc. 18-2 at 182-83.) All of those facts were well established in the record. And even if the prosecutor had said that the affair caused Jeffcoat's separation from the police force, Jeffcoat would be hard-pressed to show any resulting prejudice from Hawk's failure to object. Again, ample evidence supported Jeffcoat's kidnapping conviction, and it is clear

from the record as a whole that he *was* muscled out of his job due to the affair. Even if Hawk rendered deficient performance by failing to object (he did not), Jeffcoat simply cannot show prejudice resulting from Hawk's failure.

Finally, Jeffcoat asserts in claim 6 that Hawk rendered deficient performance by failing to introduce evidence showing that Hilda had admitted to forging a $5,200 check. (Doc. 18 at 9.) If so, it would have been useful impeachment evidence, but Jeffcoat cites to no evidence in the record to support this claim. Nor has he offered any reason to believe that counsel's failure to pursue the matter amounted to deficient performance or that it was in any way prejudicial, especially given the weight of the evidence against him, which included eye witness testimony corroborated by 911 calls, the pepper spray cloud in his house, and the suicide note, among other things.

In sum, none of Jeffcoat's trial-ineffectiveness claims satisfy *Strickland*'s deferential standard. Consequently, even assuming that

Jeffcoat showed "cause" to excuse his procedural default, he has failed to

show any resulting "prejudice." [23]

---

[23] Even if the Court was bound to consider the additional claims of trial counsel ineffectiveness raised in Jeffcoat's initial petition, they would all be rejected. He faults counsel for refusing to assert self-defense or justification as a defense against the kidnapping and sexual assault charges against him. (Doc. 1 at 39-43, 51.) Yet he was permitted to testify that any bodily harm he caused Hilda resulted from either consensual behavior or self-defense, and he presented his assertion that he merely yanked Hilda back into the truck to protect her. Given that he was permitted to argue these things at trial, the Court perceives no prejudice, much less deficient performance, in failing to assert them as affirmative defenses. He states that the prosecution was permitted to argue kidnapping under a forbidden asportation theory, without objection by counsel, but he fails to make any citation to the record showing as much. (*Id.*) Nor has he offered any argument showing that asportation was not proved under the applicable test laid out in *Garza v. State*, 284 Ga. 696, 702 (2008). While he steadfastly insists that "kidnapping can only occur in one way," that has never been the law. (Doc. 1 at 58.) Even under *Garza*, kidnapping can occur in several ways and at several times, so long as the four asportation factors weigh in favor of finding asportation.

Counsel also failed to argue that Hilda moved money from their shared bank account, which Jeffcoat insists would have shown the jury that Hilda had a motive to file false criminal charges against him. (*Id.* at 50-51.) Given the overwhelming evidence of Jeffcoat's guilt and the fact that it was plainly apparent to the jury that Hilda might have a reasons to prevaricate due to the nature of the divorce, the Court can discern no prejudice. Jeffcoat says counsel was bound to report to the judge that a male juror had told him that someone had advised him that the jury must convict petitioner of at least one count. (*Id.* at 53, 56.) Hawk testified, however, during the state habeas proceeding that the juror simply asked him for a card. (Doc. 21-2 at 24.) Jeffcoat never rebutted Hawk's statement.

Many of the remaining claims are simply undeveloped or contrary to the record. He asserts that Caleb Banks rendered deficient performance when he appeared solely for the arraignment by "waiving 'all formalities'", but he utterly fails to point to any prejudice resulting from that decision. (Doc. 1 at 11.) He frequently complains that his trial attorney was deficient for failing to object to supposed prosecutorial misconduct, but he makes no citation to the record, and he repeatedly falls short of showing resulting prejudice. (*Id.* at 36-38, 45-48.) He conclusorily states that his trial counsel colluded with the court and state in order to deprive him of his appellate rights, though he clearly made that decision of his own accord, as explained in text. (*Id.* at 33.) Nor can the Court find any fault with defense counsel for repeatedly

## B. Surviving Claims

The only two claims that merit consideration are Jeffcoat's claims that Hawk performed deficiently by withdrawing so late in the proceedings that it was impossible to proceed *pro se* on appeal, and that the trial court erred by failing to appoint counsel on appeal. (Doc. 18 at 11, 22.) The state habeas court decided both matters adversely to him.

When discussing the late withdrawal claim, the state court noted that:

> [t]he evidence does not support Petitioner's contention [that Hawk's late withdrawal prevented Jeffcoat from proceeding *pro se*]. Mr. Hawk withdrew from representing the Petitioner after the motion for new trial hearing. (HT 1377-78). Petitioner later terminated his direct appeal when he filed pro se a motion to dismiss appeal with the Court of Appeals. (HT 354). Clearly,

withdrawing Jeffcoat's *pro se* filings before the trial court. (*Id.* at 44.) Jeffcoat insists that his attorney deprived him of the right to present good character evidence, which is utterly contrary to the record. (*Id.* at 38.) He states that counsel failed to object to the prosecution's vouching for testimony of a state witness. (*Id.* at 45.) But he never states which witness. He next complains that counsel failed to preserve certain evidence from the first trial, but again, he fails to make any argument as to how that failure was prejudicial. (*Id.* at 49.) He claims that counsel also failed to object to the testimony of Hilda on rebuttal, but he doesn't specify on what ground. (*Id.* at 52.) Next, the trial judge "absented himself" (for a funeral) during jury deliberations, yet counsel did not object. (*Id.* at 55.) Again, he has failed to make even a bare attempt at a prejudice showing. Similarly, counsel failed to object to the jury charge problem, discussed in text, until after the trial. (*Id.* at 58.) Again, how was this prejudicial? He ultimately won on the matter and received a lower sentence. Finally, he states that counsel failed to object to a fatal variance in the indictment. (*Id.* at 59.) Again, he cites no law and offers no citations to the record.

> Petitioner represented himself on direct appeal. Therefore, this claim of appellate counsel ineffectiveness is without merit.

(Doc. 20-5 at 21.) The state court committed no *Strickland* error in finding that Jeffcoat did in fact represent himself on direct appeal. Jeffcoat had the opportunity to proceed *pro se* on appeal, and he even had the opportunity to request appointed counsel. He chose to forego both by withdrawing the appeal.

The second claim, that the trial court erred by failing to appoint counsel on appeal, fails for the same reasons explained at length by the state habeas court in its second order, which the Court described above. Briefly, the trial court operated under the reasonable assumption that Johnson would represent Jeffcoat on appeal, and Jeffcoat never disabused the court of that assumption. The Court defers[24] to the state habeas court's fact-finding:

---

[24] Rulings on fully adjudicated issues must "be given the benefit of the doubt," *Felkner v. Jackson*, 562 U.S. ___, 131 S. Ct. 1305, 1307 (2011) (quotes and cite omitted), which means this Court cannot disturb them unless they

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, *clearly established* Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The situation in which Petitioner finds himself is the unfortunate masterpiece of his own intransigence. Although the trial court never had the opportunity to determine whether Petitioner acted with reasonable diligence in obtaining an appellate attorney's services and whether the absence of an appellate attorney was attributable to reasons beyond the defendant's control, the evidence adduced in these habeas proceedings shows there would have been ample ground for the trial court to conclude the absence of an appellate attorney was attributable to reasons *exclusively within* defendant's control.

(Doc. 31-1 at 8-9.)   Given these facts, the trial court did nothing wrong in failing to appoint counsel.   Jeffcoat's assertion that the trial court somehow discriminated against him based upon his indigence is simply without merit.   (Doc. 18 at 20.)   Accordingly, this claim must also be denied.

---

28 U.S.C. § 2254(d) (emphasis added).   "Clearly established" means a Supreme Court holding, not dicta, and a holding that exists at the time of the state court decision that applies the legal principle at issue.   *Cullen v. Pinholster*, 563 U.S. ___, 131 S. Ct. 1388, 1399 (2011); *Thaler v. Haynes*, 559 U.S. 43, 47 (2010); *Hunt v. Comm'r, Ala. Dept. of Corrs.*, 666 F.3d 708, 720 (11th Cir. 2012); *Bowles v. Sec'y for Dep't of Corrs.*, 608 F.3d 1313, 1315 (11th Cir. 2010).   Lower court opinions, even if directly on point, will not suffice.   *Bowles*, 608 F.3d at 1316.

Petitioners face a highly deferential, "difficult to meet" standard on federal habeas review.   *Harrington v. Richter*, 562 U.S. ___, 131 S. Ct. 770, 786 (2011); *Cullen v. Pinholster*, 563 U.S. ___, 131 S. Ct. 1388, 1398 (2011).   "[A] state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 131 S. Ct. at 786-87, quoted in *Hill v. Humphrey*, 662 F.3d 1335, 1345 (11th Cir. 2011) (en banc).   This Court also must presume state court factual determinations to be correct; petitioners must rebut that presumption by clear and convincing evidence.   28 U.S.C. § 2254(e).

## III. CONCLUSION

For the foregoing reasons, Jeffcoat's petition pursuant to 28 U.S.C. § 2254 should be **DENIED**.   Moreover, applying the Certificate of Appealability (COA) standards set forth in *Brown v. United States*, 2009 WL 307872 at * 1-2 (S.D. Ga. Feb. 9, 2009) (unpublished), the Court discerns no COA-worthy issues at this stage of the litigation, so no COA should issue.   28 U.S.C. § 2253(c)(1); *see Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (approving *sua sponte* denial of COA before movant filed a notice of appeal).   And, as there are no non-frivolous issues to raise on appeal, an appeal would not be taken in good faith. Thus, *in forma pauperis* status on appeal should likewise be **DENIED**. 28 U.S.C. § 1915(a)(3).

**SO REPORTED AND RECOMMENDED**, this  27th  day of March, 2014.

_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA